472 F.2d 659
 CHRYSLER CORPORATION, Petitioner,
v.
DEPARTMENT OF TRANSPORTATION et al., Respondents.
JEEP CORPORATION, Petitioner,
v.
DEPARTMENT OF TRANSPORTATION et al., Respondents.
AMERICAN MOTORS CORPORATION, Petitioner,
v.
DEPARTMENT OF TRANSPORTATION et al., Respondents.
FORD MOTOR COMPANY, Petitioner,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION et al., Respondents.
AUTOMOBILE IMPORTERS OF AMERICA, Petitioners,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION et al., Respondents.
 Nos. 71-1339, 71-1348-1897, 71-1349-1896, 71-1350-1826, and 71-1546.
 United States Court of Appeals,
Sixth Circuit.
 Dec. 5, 1972.
 
 John H. Pickering, Washington, D. C., for Ford.
 Victor E. DeMarco, Cleveland, Ohio, for Chrysler Corp.; Jones, Day, Cockley & Reavis, Cleveland, Ohio, Keith A. Jenkins, Victor C. Tomlinson, Michael W. Grice, Detroit, Mich., on brief.
 Milton D. Andrews, Washington, D. C., for Automobile Importers of America; Busby, Rivkin, Sherman, Levy & Rehm, Washington, D. C., on brief.
 William E. Carroll, Detroit, Mich., for American Motors Corp. and Jeep Corp.; Cross, Wrock, Miller & Vieson, Jay A. Herbst, Detroit, Mich., on brief; Forrest A. Hainline, Jr., Vice President and Gen. Counsel-American Motors Corp., Detroit, Mich., of counsel.
 Raymond D. Battocchi, Washington, D. C., for appellees; Lowell Dodge, Center for Auto Safety, Washington, D. C., L. Patrick Gray, III, Asst. Atty. Gen., Walter H. Fleischer, Morton Hollander, Attys., Dept. of Justice, Washington, D. C., on brief; John W. Barnum, Gen. Counsel, Dept. of Transp., New York City, Lawrence G. Schneider, Chief Counsel, Richard B. Dyson, Frank Berndt, Asst. Chief Counsels, John G. Womack, Atty., Washington, D. C., National Highway Traffic Safety Administration, of counsel.
 Before WEICK, PECK and MILLER, Circuit Judges.
 JOHN W. PECK, Circuit Judge.
 
 
 1
 The petitioners, major domestic and foreign manufacturers of automobiles, have petitioned this Court for a review of an order of the National Highway Traffic Safety Administration of the Department of Transportation, adopted pursuant to the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. Secs. 1381-1461, entitled "Motor Vehicle Safety Standard #208, Occupant Crash Protection in Passenger Cars, Multipurpose Passenger Vehicles, Trucks and Buses." The Automobile Safety Act of 1966 was enacted as a response to the alarming number of deaths and injuries resulting from automobile accidents.[1] Its expressed purpose is ". . . to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. Sec. 1381. Chrysler Corp. v. Rhodes, 416 F.2d 319, 321 (1st Cir. 1969); General Motors Corp. v. Volpe, 321 F.Supp. 1112, 1115 (D.C.Del.1970). In achieving this goal, two courses of action are open to the Agency. (See Cong. Rep. No. 1919, 89th Cong.2d Sess., 1966, 2 U.S. Code, Cong. & Admin.News 2731 (1966).) It can act to prevent accidents,[2] or it can act to prevent injuries in the event of accidents. Standard 208 is designed to accomplish the latter.
 
 
 2
 It is now established that most injuries caused by the impact of the automobile passenger with the steering wheel and column, the dashboard, the windshield, and other interior protrusions, can be prevented or at least ameliorated by safety-oriented vehicle design, and much attention has recently been devoted to the problem of the "second collision."[3]
 
 
 3
 While many injuries of this sort can be prevented by the elimination from the interior surfaces of hard projections or sharp edges (e.g.: Standard 111, 49 C.F.R. Sec. 571.111, S3.1.2.2) and by the use of energy absorbing steering columns (Standard 203, 49 C.F.R. 571.203), and by the application of energy absorbing materials to reduce impact forces at probable points of contact in the event of rapid deceleration, (Standard 201, 49 C.F.R. 571.201, S3.1, S3.4, S3.5), the most serious injuries can be prevented only by an occupant restraint device which absorbs the high deceleration forces while firmly preventing the passenger from being thrown against the inside of the vehicle or from being ejected out of it. The idea is to assure that when the car stops dead, the passengers don't.I
 
 
 4
 The standard under review requires the petitioners to build into their vehicles by a specified date a specified quantum of "passive protection" through the use of "passive restraint devices." A passive restraint is defined as a protective occupant restraint device which does not depend for its effectiveness upon any action taken by the occupants beyond that necessary to operate the vehicle (36 F.R. 8296, May 4, 1971). An active restraint is a device which is not effective unless some action is taken by the occupants, the most familiar example of which is the fastening of a seat belt.
 
 
 5
 An "airbag" is a passive inflatable occupant restraint system. The term "airbag" is used generally to designate the entire system of apparatus in which a sensor, activated by the deceleration force of a collision, causes an explosive charge of compressed gas (or a gas generator) to rapidly inflate a large bag which restrains the occupant as he moves toward the windshield, dashboard or steering wheel of the car, and then deflates itself. This entire cycle, including the deflation, is completed in less than one-half second. Although the safety standard under review does not by its terms specify that airbags be used to meet the specified injury criteria, the petitioners unanimously contend that because the injury criteria of Standard 208 were established with the airbag in mind that the airbag is the only device which can be reasonably expected to satisfy these criteria, and that therefore, the standard is in reality an airbag requirement standard. Although nothing in the record justifies disagreement with the petitioners on this point,[4] for the purposes of this opinion we do not find it necessary to distinguish between the airbag and any other form of passive restraint.
 
 
 6
 Standard 208 was first published as part of the initial federal standards issued pursuant to 15 U.S.C. Sec. 1392(h) on February 3, 1967 (32 F.R. 2415 (1967) "Seat Belt Installation-Passenger Cars") and established the requirements for seat belt installations. No objections were made to this requirement, and the standard remained unchanged until March 10, 1970. On that date the Agency published what is now generally referred to as Revised Standard 208, New Standard 208 or, more descriptively, the Airbag Standard. The amendment procedure has produced to date a series of twenty-four notices, consisting of notices of proposed rulemaking, notices of meetings, and various final amendments to the existing standard. Not all of these notices are important to the case presented to us, but a brief review of their chronology will help to put into perspective the course of the Agency's action in the promulgation of Standard 208, and its reaction to the industry's comments, and is necessary to an evaluation of many of the petitioners' challenges to the procedure utilized by the Agency.
 
 
 7
 A proposed change in the initial Standard 208 was first announced in Notice 1, published on July 2, 1969, entitled "Inflatable Occupant Restraint Systems" (34 F.R. 11148). In this advance notice of proposed rulemaking, the Agency observed that a promising system of restraint, commonly referred to as "airbags," was in the final stages of development and that it would be desirable that such a system be provided on new motor vehicles as soon as possible, and not later than January 1, 1972. Information was requested, and a public meeting was scheduled at which interested parties presented their views on the concept of mandatory, industry-wide installation of airbags (Notices 2 and 3, 34 F.R. 12107, 13480). Written comments were submitted as requested and as required by the APA Sec. 4(c), 5 U.S.C. Sec. 553(c).
 
 
 8
 After a lengthy evaluation of the comments of the manufacturers and other interested parties and newly developed technical information, the Agency issued a notice of a proposed safety standard entitled "Occupant Crash Protection; Passenger Cars, Multipurpose Passenger Vehicles, Trucks and Buses" (Notice 4, 35 F.R. 7187). The proposed rule generally provided a delay in the effective date of a passive restraint system from January 1, 1972 to January 1, 1973. However, during the interim period, passenger car manufacturers were required to substitute a modified restraint system which amounted to an improved seat belt assembly. The proposal set out the procedures to be used in testing the devices and the injury criteria which must be met. A second public meeting was held (Notice 5, 35 F.R. 10120). The interim requirements of the proposed standard were modified to some extent by Notice 6 (35 F.R. 14941), which was published on September 25, 1970.
 
 
 9
 The Agency held numerous formal and informal meetings and conferences; comments were submitted by more than 120 interested persons. After consideration of these comments and other relevant materials, the Agency issued the passive protection requirements of the standard as a final rule in Notice 7 on November 3, 1970 (35 F.R. 16927). The effective date for passive systems was extended from January 1, 1973, to July 1, 1973, for front seat positions and to July 1, 1974, for all occupants; the injury criteria proposed in Notice 4 were modified in some respects. Notice 8, (35 F.R. 16937) issued simultaneously with Notice 7, was a proposal for further modifications of the standard as to a new requirement that deployable systems should not deploy in impacts of less than 15 miles per hour (mph), and for additional injury criteria for various test modes.
 
 
 10
 In response to a variety of objections raised in comments and in petitions for reconsideration, the Agency republished Standard 208 on March 10, 1971, as Notice 9 (36 F.R. 4600), a complete and final rule. This notice forms the basis of the Agency's action which is before this Court for review. This notice incorporated a change in the effective date for passive restraints from July 1, 1973, to August 15, 1973, to reflect the historic model change-over period of the automobile industry. Certain concessions were made for open body vehicles and forward control vehicles, and the Agency indicated that it intended to issue further specifications for the anthropomorphic test devices which the manufacturers had suggested were too vague and which therefore produced inconsistent test data.
 
 
 11
 The Agency issued Notice 10 (36 F.R. 12858) in response to the petitions for reconsideration of Notice 9. This notice amended the requirements for the seat belt warning system option which was to become effective January 1, 1972. Notice 11 (36 F.R. 12866), issued simultaneously with Notice 10, proposed certain release requirements should a seat belt assembly be used as a passive restraint system, and requires that airbags be self-deflating.
 
 
 12
 Notice 12 (36 F.R. 19254) was issued on October 1, 1971, as a response to the petitions for reconsideration of Notice 9, and is the second of the two notices which this Court has been requested to review. This notice refers to a proposed rule, issued simultaneously, to delay one of the effective dates of Notice 9, and comments upon the necessity of later rulemaking in the standard. This amendment clarifies the monitoring system requirements for a passive system, specifies the positioning and locations of the anthropomorphic test devices and changes the cargo weight to be used for testing multipurpose passenger vehicles and trucks. In the comments to Notice 9, the Agency acknowledged that the test dummy specifications were inadequate and that variances in dummies could jeopardize the test results of a vehicle attempting to comply with the standard. The Agency stated that it would issue, at a later date, proposed amendments to the standard detailing performance and descriptive specifications for the test dummies. In the interim, the Agency stated in the comments to Notice 12 that if a vehicle is found to comply with the existing standard under a properly conducted test by a manufacturer the negative results of an Agency test will not be used as the basis for a finding of non-compliance so long as the difference in the test results can be attributed to the test dummies.
 
 
 13
 Notice 13 (36 F.R. 19266), issued simultaneously with Notice 12, proposed an amendment to Standard 208 which would allow for an additional interim option of a seat belt interlock system which will not allow the engine starting system in a vehicle to operate unless the driver and any front seat passengers have fastened their seat belts. Notice 14 (36 F.R. 19705) proposed a change to conform all explosive devices to existing state and federal regulations. Notice 15 (36 F.R. 23725) was a promulgation of several minor changes concerning seat belt warning systems. On February 24, 1972, the Agency published Notice 16, (37 F.R. 3911) as a final amendment to Standard 208, basically incorporating the proposals of Notice 13 which provided for the option of a manufacturer to use seat belts equipped with an ignition interlock system between August 15, 1973, and August 14, 1975. On March 16, 1972, in Notice 17 (37 F.R. 5507), the Agency proposed further amendments to the method of calculating the head injury criteria of Standard 208. Notices 18 to 24 (37 F.R. 10745, 12393, 13265, 16186, 16604, 22871, 23115) are not directly relevant to these proceedings except that portion of Notice 19 which adopted the proposed amendments of Notice 17.
 
 
 14
 Chrysler, Jeep, American Motors, Ford and the Automobile Importers of America have petitioned this Court for a review of Notice 9; Ford, American Motors and Jeep have petitioned this Court for a review of Notice 12. These petitions for review were consolidated in this Court, and were argued together.
 
 
 15
 Notice 9, as amended by Notices 10, 12, 15 and 16[5] is designed to be implemented in three stages, the first two of which offer a manufacturer the choice of several options for compliance:
 
 
 16
 STAGE ONE: A manufacturer must provide on all vehicles manufactured between January 1, 1972, and August 14, 1973, one of the following three options:
 
 
 17
 (1) "Complete Passive Protection," defined as a system which meets specified injury criteria[6] for all seating positions in all impact modes, frontal (head-on into a fixed barrier at 30 mph), angular (30 degrees from either side of frontal into a fixed barrier), and side (90 degrees from frontal, impact at 20 mph with a lateral moving barrier) and which will prohibit any part of two test dummies from extending outside any part of the car in a rollover test (rollover in either lateral direction at 30 mph); or
 
 
 18
 (2) Sufficient interior padding plus lap belts such that the prescribed injury criteria are met at the front outboard positions with test dummies in a 30 mph frontal crash into a fixed barrier; or
 
 
 19
 (3) Lap and shoulder belt systems with warning signals at the front outboard positions that restrain test dummies in a 30 mph frontal test crash without complete separation of the belts themselves or their anchorages, plus lap belts at other seating positions.[7]
 
 
 20
 STAGE TWO: A manufacturer must provide on all vehicles manufactured after August 15, 1973, one of the following three options:
 
 
 21
 (1) "Complete Passive Protection"; or
 
 
 22
 (2) Passive protection for front seat positions which will meet specified injury criteria in a 30 mph headon crash into a fixed barrier, plus lap belts at all other positions; or
 
 
 23
 (3) Seat belts with ignition interlocks[8] for front seat passengers, plus non-interlocked belts at other positions which must meet the specified injury criteria for front outboard occupants in a 30 mph impact into a fixed barrier.
 
 
 24
 STAGE THREE: By August 15, 1975, a manufacturer must provide "Complete Passive Protection."
 
 II
 
 25
 A threshold issue is raised concerning this Court's scope of review of Motor Vehicle Safety Standards. The manufacturers contend that this Court must determine whether the Standard is supported by "substantial evidence on the record as a whole," and they rely upon the legislative history of the Act, upon the provisions of the Administrative Procedure Act, and upon Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The agency contends that because the rule under review is not the product of adjudication, but of informal rulemaking which is a legislative process, this Court's review is restricted to a determination of whether the Agency complied with applicable procedural requirements and whether the Agency's rule reflects a "rational consideration" of the relevant matters presented by interested parties.
 
 
 26
 We think that the scope of review urged upon this Court by the Agency is virtually no review at all; the Agency seems to ignore the existence of its record as well as the substantive limitations which the Act places upon its authority to set standards.[9] Thus, even though the Agency may proceed by informal rulemaking, the Act requires that several substantive criteria be met, and also provides for direct review of that rule by a United States Court of Appeals on the basis of the record which was compiled during the course of the rulemaking.
 
 
 27
 The Automobile Safety Act of 1966 (15 U.S.C. Secs. 1381-1431) which empowers the Agency to set minimum performance standards for newly manufactured automobiles, provides that all standards "shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms." 15 U.S.C. Sec. 1392(a). In addition, the Agency must consider relevant available motor vehicle safety data (15 U.S.C. Sec. 1392(f)(1)), and must consider "whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle . . . for which it is prescribed." 15 U.S.C. Sec. 1392(f)(3). These factors represent the statutory minimum substantive criteria against which each automobile safety standard must be tested.
 
 
 28
 Congress established a distinct procedure for direct judicial review of Motor Vehicle Safety Standards by the United States Courts of Appeals. In such cases, the Secretary of Transportation is required to file in the Court the record of the proceedings "on which [he] based his order as provided in Section 2112 of Title 28 of the United States Code." Section 2112 of Title 28 provides that "all of the evidence before the agency . . . shall be included in the record," excepting only that stipulated by the parties to be omitted as wholly immaterial to the questioned finding. Section 706(2)(E) of Title 5 provides that in a case in which statutory provision is made for review on the record of the agency, that the agency's action must be supported by substantial evidence. Clearly when factual issues are involved, including the issue of whether compliance is technologically feasible, the reviewing court must consider the record upon which the Agency based its order.
 
 
 29
 The Agency contends that under the authority of California Citizens Band Assn. v. United States, 375 F.2d 43 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967), it can act on the basis of evidence in its own files, and it does not have to make this evidence available to a litigant seeking judicial review. This may be true in a situation such as was present in that case, where the Agency needed only to make a discretionary decision unencumbered with factual or technical considerations of any kind. In that case, the petitioners requested a review of rules promulgated by the FCC dealing with the use of radio frequencies. The FCC had selected seven frequencies to be used by private radio operators under the new rules of interstate communications. There was no factual question raised in the selection of the frequencies; this was purely a matter of administrative discretion, and consequently was subject to a very narrow scope of review. Furthermore, the statutory language which empowered that Agency to act did not require the compiling of a record as the basis for its action. This is clearly not the case with the Automobile Safety Act which requires the Secretary to "consider relevant available motor vehicle safety data, including the results of research, development, testing and evaluation activities" and to "consult with the Vehicle Equipment Safety Commission, and such other State or interstate agencies (including legislative committees) as he deems appropriate." 15 U.S.C. Sec. 1392(f)(1)(2).
 
 
 30
 It seems clear that any rule which is required to be, inter alia, "practicable" and "objective" must be reviewed on the basis of the data which the Agency considered in its promulgation, regardless of whether formal hearings were or were not held. In Automotive Parts and Accessories Assn. v. Boyd, 132 U.S.App. D.C. 200, 407 F.2d 330 (1968), the Court was presented with the issue of whether informal rulemaking was authorized by the Act. The Court found that it was, and then upheld the safety standard there under review by looking at the underlying record to determine whether there was a factual basis for the Agency's decisions, and whether the required "concise general statement" of the Agency's purpose was properly supported.[10] See also, Boating Industry Assn. v. Boyd, 409 F.2d 408 (7th Cir. 1969) where the identical procedure was followed.
 
 
 31
 An agency performing a rulemaking function need not always compile a record of the material upon which its rule is based. It may act on the basis of data contained in its own files or on its own views or opinions. In such cases, a reviewing court cannot test the rule as promulgated against the evidence in the agency's record. Flying Tiger Line, Inc. v. Boyd, 244 F.Supp. 889 (D. C.1965). In this case, however, the Agency's freedom of action in regard to the rules it may promulgate is limited by a Congressional mandate which also requires the Secretary to compile a record. As observed in Overton Park, supra, the substantial evidence test may be applied to agency action even when the agency is performing a rulemaking function. 401 U.S. at 414-415, 91 S.Ct. 814, 28 L.Ed.2d 136. Accordingly, the reviewing court must "engage in a substantial inquiry" and a "thorough, probing, in-depth review," yet at the same time must be mindful that the ultimate scope of its review is narrow and that it may not substitute its judgment for that of the agency's. 401 U.S. at 416, 91 S.Ct. 814, 28 L.Ed.2d 136.[11]
 
 
 32
 Any safety standards issued pursuant to the Automobile Safety Act of 1966 must be tested for compliance with the statutory limitations of that Act, and this testing can only be done against the record. The record includes not only the notices of the Agency as published in the Federal Register and the comments and petitions for reconsideration submitted by interested parties, but also the technological and statistical data relied upon by the Agency in arriving at its conclusions. That this material is, or should be, a part of the record in this case is clear from the legislative direction that the Agency "consider relevant available motor vehicle safety data, including the results of research, development, testing and evaluation activities conducted pursuant to this chapter," 15 U.S.C. Sec. 1392(f)(1), and that the Secretary shall, in the event that a petition for review is presented to a Court of Appeals, file in that court the record upon which he based his actions. 15 U.S.C. Sec. 1394(a)(1).[12] To the extent that this conclusion is inconsistent with that reached by the Seventh Circuit in Boating Industry Assn. v. Boyd, supra, we respectfully decline to follow that decision.
 
 
 33
 Our review does not end with a determination that these statutory criteria have been met. Section 706(2)(A) of the Administrative Procedure Act requires a finding that the actual decision reached was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As pointed out in Overton Park, supra, to make this finding, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. 401 U.S. at 416, 91 S.Ct. 814, 28 L.Ed.2d 136.
 
 
 34
 One further observation may serve to demonstrate the impracticality of the Agency's argument that only the procedural aspects of a motor vehicle safety standard are subject to review brought pursuant to 15 U.S.C. Sec. 1394. Once such a standard has been adopted and becomes effective, the validity of that standard is capable of being placed in issue in litigation in any of a number of ways. For example,[13] 15 U.S.C. Sec. 1398 provides for the imposition of sanctions in the form of fines against anyone who manufactures for sale or offers for sale a motor vehicle which does not conform with applicable federal safety standards. An obvious defense in such a prosecution would be the claimed invalidity of the standard and it seems clear that a previous judicial review limited to an approval of the procedural aspects of the adoption of the standard would not bar the defense. Such a defense might be successful at any judicial level, but the adjudication would almost certainly not be considered final until the Supreme Court had reviewed the issue or had refused to do so. In the interval preceding such final adjudication, which could be a substantial one, a chaotic condition would exist within the industry to the serious detriment of the manufacturers and the public alike, perhaps accompanied by inestimable damages to both. Such a possibility strongly militates against the limitation of review urged by the Agency and supports our determination that it should be here determined whether the standard is supported by "substantial evidence on the record as a whole."[14]
 
 
 35
 In summary, the function of this Court is to test the "validity" of Standard 208. Although we are not empowered to substitute our judgment as to discretionary decisions made by the Agency, we will look to the underlying record to determine whether a factual basis exists for the Agency's decisions and to determine whether the statutorily required concise general statement of the Agency's purpose is properly supported. In order to be valid, Standard 208 must meet all statutorily prescribed criteria, and the Agency must have complied with all applicable procedural requirements. The former are contained in the Automobile Safety Act of 1966 and can be designated as substantive criteria, the latter, contained in the APA, can be designated as procedural requirements, and they can be discussed separately.
 
 III
 
 36
 The petitioners' first argument is that the Automobile Safety Act of 1966 does not authorize the Agency to establish a safety standard which requires the improvement of existing technology, and that the Agency may only establish performance requirements which can be met with devices which, at the time of the rulemaking, are developed to the point that they may be readily installed. The Agency's response is that inasmuch as the technology of airbags is fully developed, and inasmuch as airbags are presently readily available to all manufacturers, this issue is not properly before the Court in this case. The Agency also contends that, even if that were not so, one of the prime purposes of the Act is to require automobile manufacturers to develop safety technology not presently existing.
 
 
 37
 The explicit purpose of the Act, as amplified in its legislative history, is to enable the Federal government to impel automobile manufacturers to develop and apply new technology to the task of improving the safety design of automobiles as readily as possible.[15] The Senate Report, in a section entitled "Purpose and Need," states:
 
 
 38
 "[T]his legislation reflects the faith that the restrained and responsible exercise of Federal authority can channel the creative energies and vast technology of the automobile industry into a vigorous and competitive effort to improve the safety of vehicles." S.Rep. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2709 (1966).
 
 The same report continues:
 
 39
 "While the bill reported by the committee authorizes the Secretary to make grants or award contracts for research in certain cases, a principal aim is to encourage the auto industry itself to engage in greater auto safety and safety-related research." Id. at 2718.
 
 
 40
 There is no suggestion in the Act that developed technology be in use by an automobile manufacturer or that any given procedure be an established industry practice prior to its incorporation into a federal motor vehicle safety standard. If the Agency were so limited, it would have little discretion to accomplish its primary mission of reducing the deaths and injuries resulting from highway accidents.
 
 
 41
 In fact, specific efforts by the Automobile Manufacturers Association to tie the rate of innovation imposed by safety standards to the pace of innovation of the manufacturers were rejected by the House Committee on Interstate and Foreign Commerce,[16] and the reported bill proposed that safety standards be "practicable, meet the need for motor vehicle safety, and be stated in objective terms."
 
 
 42
 *****
 
 
 43
 * * *
 
 
 44
 *****
 
 
 45
 * * *
 
 
 46
 In explaining the purpose of the first of these criteria, the House Report states:
 
 
 47
 "In establishing standards the Secretary must conform to the requirement that the standard is practicable. This would include consideration of all relevant factors, including technological ability to achieve the goal of a particular standard as well as consideration of economic factors." H.R.Rep. 1776, p. 16.
 
 
 48
 If the Agency were limited to issuing standards only on the basis of devices already in existence, there would be no need for the Agency to give any consideration to the manufacturers' technological ability to achieve a stated goal. Under this proposed interpretation, the Agency would be unable to require technological improvements of any kind unless manufacturers voluntarily made these improvements themselves. This is precisely the situation that existed prior to the passage of the Act, and we decline to eviscerate this important legislation by the adoption of this proposed interpretion. As it stands, the Act is reasonable, and the power of the Agency to "channel the creative energies and vast technology of the automobile industry into a vigorous and competitive effort to improve the safety of vehicles" fully meets the need for motor vehicle safety.
 
 
 49
 We do not intend to suggest that the Agency might impose standards so demanding as to require a manufacturer to perform the impossible, or impose standards so imperative as to put a manufacturer out of business. But it is clear from the Act and its legislative history that the Agency may issue standards requiring future levels of motor vehicle performance which manufacturers could not meet unless they diverted more of their resources to producing additional safety technology than they might otherwise do. This distinction is one committed to the Agency's discretion, and any hardships which might result from the adoption of a standard requiring, as does Standard 208, a great degree of developmental research, can be ameliorated by the Agency under 15 U.S.C. Sec. 1392(c). This section allows the Secretary to extend the effective date beyond the usual statutory maximum of one year from the date of issuance, as he has done with Standard 208. The Senate report, in explaining this section, confirms the conclusions reached above:
 
 
 50
 "The power to specify a later effective date is needed because it may be a practical economic and engineering impossibility, as well as a source of great hardship and unnecessary additional cost, to require that all vehicle changes required by any new safety standard, whatever its scope or subject matter, be accomplished by all manufacturers on all their vehicles within 1 year." S.Rep. 1301, 89th Cong. 2d Sess., 2 U.S.Code., Cong. and Admin.News, 2714 (1966).
 
 
 51
 Similarly, should it develop that, as the time for implementation of federally mandated devices approaches, such devices will require further testing or development, upon a showing to the Agency by the manufacturers or the developers the Agency should again review the matter and decide whether to extend the time for implementation or to alter, or even to abandon, the project.
 
 
 52
 In summary, the Agency is empowered to issue safety standards which require improvements in existing technology or which require the development of new technology, and it is not limited to issuing standards based solely on devices already fully developed. This is in accord with the Congressional mandate that "safety shall be the overriding consideration in the issuance of standards." S.Rep. 1301, 2 U.S.Code, Cong. & Admin.News, p. 2714 (1966).
 
 
 53
 The petitioners next contend that Standard 208 is not practicable because airbag technology is not, at present, developed to the point where airbags can be installed in all presently manufactured cars. In light of our preceding conclusion, we need not discuss this contention at length. But we will observe that, as the record indicates, many of the development problems with which the petitioners have concerned themselves in their briefs (such as noise, sensor reliability, danger to out of position occupants and effectiveness in certain nonfrontal impact modes), have been eliminated or are presently the subject of continuing development efforts. We need not detail here the immense amount of factual data contained in the record relevant to this issue; suffice it to here observe that present systems demonstrate considerable sophistication over earlier prototypes. In addition, several automobile manufacturers and several airbag developers have expressed a great deal of confidence in their present systems and an equal confidence that present developmental research programs will eliminate any obstacles which may presently remain.
 
 
 54
 For example, General Motors announced in 1970 that final research and development efforts on its airbag system were currently underway, that it was entering the production design stage on those bags, and that it planned to introduce its system on a phased-in schedule so that by the fall of 1974, all 1975 model GM passenger cars and light trucks would have a passive protection system as standard equipment.[17] Eaton has indicated that it has largely eliminated noise as a problem and that it expected, in the near future, to solve the problem of the effect of airbag detonation on a child standing near the dashboard. On October 1, 1971, Irvin Industries stated that it had built a system which met or exceeded all published U.S. government specifications in effect at that time.[18] Most recently, the Ford Motor Company delivered to the Chairman of the Board of Allstate Insurance Company an automobile equipped with an airbag restraint system for the front seat passenger. This vehicle was the first of a fleet of 200 similarly equipped cars which Allstate has purchased for use by selected employees in a joint field-test of these systems with Ford. While there is some disagreement as to the significance of this event, we do note that the insurance company involved has publicly expressed a large measure of confidence in the reliability and effectiveness of the system as delivered, and in the developmental research program of which this test is a vital part.
 
 
 55
 Since we have rejected the petitioners' contention that nonexisting technology may not be the subject of motor vehicle safety standards, and in view of the present state of the art of passive inflatable occupant restraint systems, we conclude that Standard 208 is practicable as that term is used in this legislation.[19]
 
 
 56
 The petitioners contend that Standard 208 does not meet the need for motor vehicle safety because belts offer better protection to occupants than do airbags. The Agency defends the standard by contending that airbags offer better protection to occupants than do belts. The record supports the conclusion that each type of occupant restraint offers protection in a slightly different form for differing impact situations. Neither is clearly superior to the other in every respect. Consequently, we conclude that the Agency's decision to abandon active restraints in favor of passive restraints was a proper exercise of its administrative discretion.
 
 
 57
 Paramount among the Agency's considerations in deciding to require all occupant restraint systems to be fully passive was the factor of low belt usage. It is uncontested that active restraints are not extensively used. The record indicates that usage rates for lap belts are about 20 to 30%, and for the lap and shoulder harness combination about 1 to 5%; it is projected that devices (or laws) to encourage or to force belt usage will not increase usage rates above 60%. The petitioners' position is that, if the Agency starts with the proposition that occupants are not now using belts, its consequent course of action should be an effort to increase belt usage through whatever means are available (e. g.: ignition interlocks, compulsory usage laws) rather than to disregard active restraints entirely and require passive protection in all vehicles.
 
 
 58
 It is conceded that belts, when used, are extremely effective. The conclusive evidence on this point is a study of more than 28,000 accident cases in Sweden which showed that no occupant wearing a combined lap belt and shoulder harness was fatally injured in any accident occurring at speeds below 60 miles per hour.[20] On the other hand, while belts are superior to airbags in some respects, most notably in rollovers and multiple impact situations, airbags have advantages over belts in other equally important respects. For example, airbags spread crash deceleration forces over most of the whole body, while belts concentrate them on the narrow area of the rigid belt. Airbags restrain the body evenly over a greater distance and a longer period of time by permitting occupants who are thrown forward in the crash to ride down the deceleration forces more gradually, over a distance of two or three feet. An airbag system, being passive, removes the elements of the occupants' will, memory and skill from the consideration of reliability. Furthermore, many people cannot properly use belt systems (e. g.: children under four years of age, persons under 55 inches in height, obese or very smallwaisted persons and pregnant women) and among those who can, there is an inevitable percentage who will not wear them properly. We cite these facts not to advocate belts over airbags or vice versa, but to indicate the myriad factors which must be carefully considered by the Agency in reaching a conclusion on this issue.
 
 
 59
 We conclude that the issue of the relative effectiveness of active as opposed to passive restraints is one which has been duly delegated to the Agency, with its expertise, to make; we find that the Agency's decision to require passive restraints is supported by substantial evidence, and we cannot say on the basis of the record before us that this decision does not meet the need for motor vehicle safety.
 
 IV
 
 60
 We now turn to the final major substantive argument presented by the petitioners: that Standard 208 fails to meet the statutorily required criteria of objectivity. The necessity for objective certainty in the performance requirements of safety standards was clearly recognized by Congress in the Safety Act. The Act provides, as noted above, that "standard[s] shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms." 15 U.S.C. Sec. 1392(a). These requirements are repeated in the statutory definition of motor vehicle safety standards: "'Motor vehicle safety standards' means a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." 15 U.S.C. Sec. 1391(2). The requirement of objectivity was emphasized in the following statement from the House Report: "In order to insure that the question of whether there is compliance with the standard can be answered by objective measurements and without recourse to any subjective determination, every standard must be stated in objective terms." H.R. 1776, 89th Cong. 2d Sess.1966, p. 16.
 
 
 61
 The importance of objectivity in safety standards cannot be overemphasized. The Act puts the burden upon the manufacturer to assure that his vehicles comply under pain of substantial penalties.[21] In the absence of objectively defined performance requirements and test procedures, a manufacturer has no assurance that his own test results will be duplicated in tests conducted by the Agency. Accordingly, such objective criteria are absolutely necessary so that "the question of whether there is compliance with the standard can be answered by objective measurement and without recourse to any subjective determination."Objective, in the context of this case, means that tests to determine compliance must be capable of producing identical results when test conditions are exactly duplicated, that they be decisively demonstrable by performing a rational test procedure, and that compliance is based upon the readings obtained from measuring instruments as opposed to the subjective opinions of human beings.[22] Standard 208 requires that compliance be determined by specified tests using an anthropomorphic dummy built to the specifications of SAE Recommended Practice J963, "Anthropomorphic Test Device for Dynamic Testing." These specifications generally provide for the structural characteristics of the dummy, which is to simulate the basic human body components in size, shape, mass and kinematics. The petitioners contend that this test device will not produce consistent, reliable, or repeatable test results.
 
 
 62
 The record supports the conclusions that the test procedures and the test device specified by Standard 208 are not objective in at least the following respects: (1) The absence of an adequate flexibility criteria for the dummy's neck; the existing specifications permit the neck to be very stiff, or very flexible, or somewhere inbetween, significantly affecting the resultant forces measured on the dummy's head. (2) Permissible variations in the test procedure for determining thorax dynamic spring rate (force deflection characteristics of the dummy's chest) permit considerable latitude in chest construction which could produce wide variations in maximum chest deceleration between two different dummies, each of which meets the literal requirements of SAE J963. (3) The absence of specific, objective specifications for construction of the dummy's head permits significant variation in forces imparted to the accelerometer by which performance is to be measured.[23]
 
 
 63
 The shortcomings of the test device become understandable, if still not excusable, when one considers the minutes of a May 23, 1971, meeting of the SAE Crash Test Dummy Subcommittee, which are a part of the record in this case. That report points out that since SAE J963 only relates some limited performance specifications for an anthropomorphic test device, it should be used as a guide for specifications of such a device, with considerations given to certain enumerated shortcomings. Further, the report mentions that "[i]t should be noted that the original document [SAE J963] was intended to specify a research tool and, therefore, the document was written in general terms," and that until more definitive specifications are published, "[t]he subcommittee is of the opinion that SAE Recommended Practice J963 can only be used as a guide rather than as a rigid set of specifications." The Safety Systems Laboratory (formerly of the office of Vehicle Systems Research, National Bureau of Standards, now of the NHTSA) reported in September of 1971 that SAE J963 is not "sufficiently definitive to provide an adequate description of the dummies" and concluded that "further study is necessary to develop standard specifications for an anthropometric crash dummy." A similar determination was made by the Cornell Aeronautical Laboratory, which concluded: "More complete specification of anthropomorphic dummy characteristics is needed. While it is tentatively concluded that a degree of repeatability is obtainable with existing dummies, the dynamic performance of these devices needs specification designed to insure repeatability."
 
 
 64
 Further recitation of statements from the record that the test procedure and devices of Standard 208 lack objectivity is unnecessary because, interestingly enough, the Agency has never asserted that its test criteria are fully objective. Although the Agency noted, at the time it first proposed the adoption of SAE J963, that these dummy specifications "may not provide totally reproducible results," it justified their adoption because they are "evidently the most complete set available at this time." 35 F.R. 7188. Specific comments were requested from interested parties; comments were submitted by each of the parties to this action.[24] The Agency replied to these comments in Notice 7 by modifying the specifications slightly, but retained the requirement of the SAE J963 dummy, noting only that "dummies conforming to the SAE specifications are the most complete and satisfactory ones presently available." 35 F.R. 16928. In Notice 9, the Agency again remarked not that the SAE J963 dummy was adequate, but that it was the "best available," and that it was sponsoring research in this area and would therefore issue new specifications at some time in the future. Virtually all automobile manufacturers, including each of the present petitioners, submitted petitions for reconsideration to these requirements of Notice 9. General Motors went so far as to supply suggested modifications and additions to the SAE J963 test device specifications which it felt were necessary before a device would provide consistent test results.
 
 
 65
 Finally, the Agency conceded in its most recent official pronouncement on the subject, Notice 12, that the specifications contained in SAE J963 "do not completely define all the characteristics of the dummies that may be relevant to their (and the vehicle's) performance in a crash test." 36 F.R. 19255. That notice, however, retains the requirement.
 
 
 66
 The Agency makes two responses to the attacks upon the standard's lack of objectivity. First, it contends that the incompleteness of the dummy device is not fatal to the standard because it has assured the manufacturers that specifications for a suitable test device will be issued in the future.[25] We do not think it necessary to dwell upon the obvious inadequacy of this response because it seems to us axiomatic that a manufacturer cannot be required to develop an effective restraint device in the absence of an effective testing device which will assure uniform, repeatable and consistent test results.
 
 
 67
 The Agency's second response is that it has assured the manufacturers that their position with regard to compliance will not be jeopardized by the variances in the test device. The Agency's solution to the problem was set out in Notice 12:
 
 
 68
 "If the NHTSA concludes after investigation that a manufacturer's tests are properly conducted, with dummies meeting the specifications, and show compliance with the standard, and that differences in results from tests conducted by the agency are due to differences in the test dummies used by each, the Agency tests will not be considered to be the basis for a finding of noncompliance." 36 F.R. 19255.
 
 
 69
 This statement is illusory. This test allows as many as three subjective judgments to be made by the Agency, including the ultimate determination of whether the differences in results from tests conducted by the Agency are due to differences in the test dummies used by each. As noted above, objectivity requires that each essential element of compliance be made by specified measuring instruments; there is no room for an "agency investigation" in this procedure. The inherent uncertainty of this procedure is no substitute for the specification of an adequate test device, especially in light of the Agency's power to specify such a device. As the Agency noted in Notice 12:
 
 
 70
 "[S]ince the dummy is merely a test instrument and not an item of regulated equipment, it is not necessary to describe it in performance terms; its design could legally be 'frozen' by detailed, blueprint-type drawings and complete equipment specifications." 36 F.R. 19255.
 
 
 71
 While we have concluded that automobile manufacturers can (and should) be compelled by automobile safety standards to develop new safety devices, we hold that the performance goals which they must meet must be clearly delineated by the Agency. That is to say, while they can be required to develop a new device not presently existing, we do not think that they can (or should) simultaneously be required to develop a testing device by which the safety device is to be measured.
 
 
 72
 The Amicus Center for Auto Safety cautions that if we were to hold that the standard is invalid because the test procedures are not objective we would be allowing "the tail to wag the dog." We think that the Center has misapprehended the anatomy of the animal. The Act requires the Agency to issue performance standards, which a manufacturer must then meet by any system of hardware it chooses. It is clear from a reading of the Act and its legislative history that the performance standards (injury criteria and test procedures) are in fact the "dog" to which a manufacturer is free to attach the tail of its choosing. To rule otherwise would be to permit the Agency to establish a "product standard" requiring airbags, without requiring it to establish adequate, objective and repeatable test procedures by which a manufacturer's airbags can be measured, by it or by the Agency, for compliance.
 
 
 73
 Since we find that the dummy as specified is inadequate for the testing purposes for which it is designated, we do not find it necessary to pass upon the petitioners' contention that the dummy is a poor predictor of human response; nor do we reach their contention that the standard is unconstitutionally vague.
 
 V
 
 74
 The petitioner Automobile Importers of America[26] contends that Standard 208 effectively eliminates convertibles and sports cars from production because these types of cars are inherently incapable of meeting the injury criteria of the standard. At issue is the question of whether the standard violates 15 U.S.C. Sec. 1392(f)(3) which provides that "In prescribing standards under this section, the Secretary shall . . . consider whether any such proposed standard is . . . appropriate for the particular type of motor vehicle . . . for which it is prescribed." The implications of this section that safety standards shall take into consideration different classes of vehicles, such as small cars, sports cars, or convertibles, and that standards shall not be used as a device to bring about their extinction, is made clear from the Act's legislative history:
 
 
 75
 "[I]n determining whether any proposed standard is 'appropriate' for the particular type of motor-vehicle equipment or item of motor-vehicle equipment for which it is prescribed, the committee intends that the Secretary will consider the desirability of affording consumers continued wide range of choices in the selection of motor vehicles. Thus it is not intended that standards will be set which will eliminate or necessarily be the same for small cars or such widely accepted models as convertibles and sports cars, so long as all motor vehicles meet basic minimum standards. Such differences, of course, would be based on the type of vehicle rather than its place of origin or any special circumstances of its manufacturer." S.Rept. 1301, 2 U.S.Code, Cong. & Admin.News, 2714 (1966).
 
 
 76
 Congressman Springer observed in the House debate that "[i]t is not the intention to deprive the public of cars by . . . outlawing types and models. . . . [This legislation] avoids imposing on the buying public a complete standardization to humdrum, dreary vehicles." 112 Cong.Rec. 19630-31 (1966). The Act clearly contemplates the continued production of sports cars and convertibles.
 
 
 77
 The special difficulties facing soft top convertibles and sports cars become obvious upon reflection. For example, Standard 208 requires a rollover test throughout which all portions of the test dummy must remain contained within the outer surfaces of the vehicle passenger compartment (p S 5.3 and p S 6.1). The comments submitted to the Agency by virtually every automobile manufacturer indicate that a considerable difficulty is being encountered with this requiremnt for vehicles with fixed steel tops because of the tendency of the roof to rupture or be punctured which, when combined with the centrifugal force operating on the dummy during the rollover, will allow the hands and arms to raise over the dummy's head and extend beyond the vehicle body perimeter.
 
 
 78
 While sufficient reinforcement should solve the problem currently being experienced with the hard top vehicles, it is obvious that a soft top convertible is inherently incapable of passing such a rigid requirement. It seems equally obvious that while the purchaser of a fixed roof automobile should expect some measure of protection from that roof, (perhaps expecting more than he is currently obtaining) owners of convertibles would not be disappointed to find that they are being afforded less protection in this area. Other problems inherent to convertibles and sports cars have been brought to the Agency's attention by several automobile manufacturers, domestic and foreign, but little if any agency action has been taken in response to these comments. This lack of response is surprising in view of the Agency's obligation to afford such vehicles special consideration, as detailed above.
 
 
 79
 Accordingly, this issue is remanded to the Agency for further consideration without prejudice to the petitioner's right to resubmit this issue to this Court for review after the Agency has been afforded an opportunity to amend Standard 208 so that it does not in fact serve to eliminate convertibles and sports cars from the United States new car market.
 
 VI
 
 80
 The petitioners' principal procedural arguments can be consolidated into the assertion that the Agency has acted arbitrarily, capriciously, irresponsibly and unlawfully by requiring manufacturers to comply with Standard 208 by a fixed date while it has consistently been issuing a rapid succession of final orders, each of which has been incomplete in several significant respects, (several have been coupled with proposed rulemaking to fill in missing parts), thereby constantly changing the basic requirements of the standard (performance criteria and test procedures), and more proposed changes are still pending. The Agency's response is that its actions in this regard reflect the extreme flexibility which is the very purpose of delegated rulemaking authority. We agree. The Safety Act gives the Secretary the authority "to issue, amend, and revoke such rules and regulations as he deems necessary to carry out [the Act]." 15 U.S.C. Sec. 1407. This broad delegation of rulemaking authority allows the Agency to amend its safety standards in those complex and technical respects which are brought to its attention as a result of petitions for reconsideration filed by "interested persons."[27] In this way the Act contemplates that a safety standard might evolve through a series of industry-suggested and agency-adopted amendments, as has been done in this case. This procedure is consistent with one of the central purposes of the Act that the automobile industry be encouraged to develop new and improved safety technology.
 
 
 81
 It is equally important to note that almost all of the changes in the requirements of which the petitioners complain were made as a result of comments or petitions for reconsideration submitted to the Agency by the petitioners themselves, and these amendments to the standard generally have relaxed the requirements or have extended the date of implementation to provide the manufacturers with additional leadtime, or to conform the date of implementation with the traditional date of the annual model changeover. These petitioners cannot be heard to complain that the Agency has constantly revised its standard when those changes were initiated by these very petitioners. We find no irregularities in the procedure utilized by the Agency in this regard.
 
 
 82
 Finally, the petitioners contend that the Agency has acted unlawfully in compiling the record which has been submitted to this Court. Specifically, they contend that substantial relevant materials were not placed on the docket of the proceeding or otherwise made available to interested parties until after petitions for review were filed in this Court. The petitioners' position is that this has prejudiced them by depriving them of an opportunity to comment upon these materials prior to the issuance of the standard in that this procedure violated the Agency's expressed policy of placing "all technical material, not routinely available through other sources, supporting or otherwise relating to proposed safety standards" in the record. (Notice 4, 35 F.R. 7188.)
 
 
 83
 We have examined the materials of which the petitioners complain, and we find that the late submission of this material (if in fact it was not timely submitted), did not serve to prejudice the petitioners in this case. The materials to which the petitioners refer consist principally of monthly progress reports from ongoing research projects conducted under the direction of the Agency in accordance with 15 U.S.C. Sec. 1395. Prior to the filing of the petitions for review in this case, the Agency placed in its general reference section of its file a research input memorandum which contained a list of the projects then in progress.[28] After these materials were docketed, several petitioners submitted comments to the Agency in response to these materials. These comments were therefore before the Agency when it issued Notice 12, and the petitioners have not alleged that the Agency failed to consider these comments in the issuance of this notice. Therefore, in that the petitioners were not prejudiced by the Agency's manner of compiling the record,[29] we do not reach the issue of whether substantial irregularities did in fact occur in the compiling of the record which is before this Court. Similarly, we do not reach a determination of whether or not the Agency's announced policy rises to the level of a "procedural regulation" as is contended by the petitioners, although we express some doubt in this regard.
 
 VII
 
 84
 We have considered the petitioners' remaining arguments and find either that they have been effectively answered by the conclusions reached above or that they are without merit.
 
 
 85
 We conclude that Paragraph S 8.1.8 of Standard 208 which requires the use of the anthropomorphic test device as defined in SAE Recommended Practice J963 to be invalid; the remaining portions of the standard which do not depend for their effectiveness upon Paragraph S 8.1.8 are valid and remain in effect. 49 C.F.R. Sec. 571.9. The proceeding is remanded to the Agency with instructions that any further specifications for test devices be made in objective terms which will assure comparable results among testing agencies, and that the effective date for the implementation of passive restraints be delayed until a reasonable time after such test specifications are issued.
 
 
 86
 WILLIAM E. MILLER, Circuit Judge (concurring in part and dissenting in part).
 
 
 87
 The effect of Judge Peck's opinion, as I construe it, is to postpone indefinitely the development of an automobile safety device which, according to the record, holds definite promise of contributing materially to the reduction in the number of deaths and serious injuries from automobile accidents. For the reasons discussed in this opinion, I do not believe that this result is required either by the National Traffic and Motor Vehicle Safety Act of 1966 nor by the motor vehicle safety standard as formulated by the administrative agency.
 
 
 88
 I concur in the statement of facts in Part I and the results reached in Parts II, III, V and VI of Judge Peck's opinion. I am in substantial disagreement with Part IV and the result reached in Part VII.
 
 
 89
 First, I disagree with the implication in the majority opinion that in all cases the National Traffic and Motor Vehicle Safety Act of 1966 makes no distinction between "motor vehicle safety standards"[1] and "methods for inspecting and testing to determine compliance with motor vehicle safety standards."[2] Second, I am not able to agree that in this case the form in which Standard 208 was promulgated precludes separating the motor vehicle safety standard from the compliance testing device and procedures. Third, I cannot agree with what I believe is an overly broad definition of the statutory word "objective."[3] Fourth, I am in disagreement with the position that under this legislation the government has the sole burden of developing and perfecting methods of compliance testing and that the National Highway Traffic Safety Administration cannot require the automobile industry to develop or refine compliance testing devices or procedures as part of its development of new technological advances in automotive safety. Fifth, I am unable to agree that Standard 208 is invalid.
 
 
 90
 * Two specific challenges are made by petitioners (Chrysler Corporation, Jeep Corporation, American Motors Corporation, Ford Motor Company and Automobile Importers of America) to the lack of objectivity of Standard 208 promulgated pursuant to 15 U.S.C. Sec. 1392(a). First, the anthropomorphic test device (dummy) referred to in Standard 208 does not meet the statutorily mandated requirement of objectivity; and second, the rollover test procedure cited in this standard is not objective.[4]
 
 
 91
 Judge Peck's opinion states that,
 
 
 92
 while they [the automobile industry] can be required to develop a new device not presently existing, we do not think that they can (or should) simultaneously be required to develop a testing device by which the safety device is to be measured.[5]
 
 
 93
 The reasoning to support this holding fails, in my view, to differentiate between the statutorily defined "motor vehicle safety standard" and any later "methods for inspecting and testing to determine compliance with motor vehicle safety standards." As I construe the opinion this result is necessitated by the National Traffic and Motor Vehicle Safety Act of 1966, not only in this specific case, but in all cases involving motor vehicle safety standards.[6] I do not agree with these conclusions since I firmly believe that a reading of the Act in its entirety indicates that these statutory terms are separate and distinct. Further, in this particular litigation, I do not think that the form in which Standard 208 was issued precludes separating the injury criteria (the actual motor vehicle safety standard) from the compliance testing device and procedures.
 
 
 94
 * Confronted with the appalling statistics of death and debilitating injuries on American highways[7] and the inexorable fact that the promotion of automotive safety through voluntary industry standards had proved inadequate,[8] Congress responded with strong, sweeping federal legislation. The paramount intent of the National Traffic and Motor Vehicle Safety Act of 1966, evidenced by the Congressional declaration of purpose in 15 U.S.C. Sec. 1381, "is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents."[9] The definition of "motor vehicle safety" contained in the Act succinctly states this Congressional resolution as well.
 
 
 95
 "'Motor vehicle safety' means the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur . . . ."
 
 
 96
 15 U.S.C. Sec. 1391(1).
 
 
 97
 To accomplish this laudable objective of motor vehicle safety, Congress determined "that it is necessary to establish motor vehicle safety standards for motor vehicles and equipment. . . ." 15 U.S.C. Sec. 1381.[10] It consequently placed an affirmative duty upon the Secretary of Transportation[11] to promulgate such standards in the first sentence of 15 U.S.C. Sec. 1392(a): "The Secretary shall establish by order appropriate Federal motor vehicle safety standards." In addition to directing the formulation of such safety standards, Congress also specified the yardstick by which such motor vehicle safety standards are to be judged in this same section: "Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms." 15 U.S.C. Sec. 1392(a). This section identifies three substantive restrictions upon each motor vehicle safety standard promulgated pursuant to the Act which are repeated in the definition section characterizing a motor vehicle safety standard:
 
 
 98
 "'Motor vehicle safety standards' means a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria."
 
 15 U.S.C. Sec. 1391(2).[12]
 
 
 * * *
 Since only the third of the statutory requirements by which a motor vehicle safety standard is to be judged is in issue at this point, it deserves repeating that these sections speak only of a motor vehicle safety standard and do not mention compliance testing: "Each such Federal motor vehicle safety standard . . . shall be stated in objective terms." 15 U.S.C. Sec. 1392(a). [Emphasis added]. "'Motor vehicle safety standards' means a minimum standard for motor vehicle performance, or motor vehicle equipment performance . . . which provides objective criteria." 15 U.S.C. Sec. 1391(2) [Emphasis added]. Both these sections utilize the same terminology except that Sec. 1391(2) uses the word "criteria" while Sec. 1392(a) uses the word "terms." Consequently, it must be determined whether Congress in using the word "criteria" in Sec. 1391(2) expanded the requirement of objectivity to apply to more than just a motor vehicle safety standard and therefore intended that the objectivity test should be applicable to compliance testing devices and procedures as well.
 Webster defines "criterion" as "a standard on which a decision or judgment may be based; . . . a standard of reference. . . ."[13] "Term" is defined by Webster as "a word or expression that has a precisely limited meaning in some uses or is peculiar to a science, art, profession, trade, or special subject."[14] From these definitions of the two words it does not appear that any significant difference was intended by Congress.[15] From a reading of the statutory text alone, it would appear that the requirement of objectivity applies only to a motor vehicle safety standard.
 Further support for this position is provided by the language of 15 U.S.C. Sec. 1396 which specifically separates and distinguishes these two concepts.
 The Secretary is authorized to advise, assist, and cooperate with, other Federal departments and agencies, and State and other interested public and private agencies, in the planning and development of-
 (1) motor vehicle safety standards:
 (2) methods for inspecting and testing to determine compliance with motor vehicle safety standards. [Emphasis added[16]
 ___
 * * *
 In light of the fact that Congress was demonstrably cognizant of a difference between "motor vehicle safety standards" and "methods for inspecting and testing to determine compliance with motor vehicle safety standards," and in Secs. 1391(2) and 1392(a) chose only the words "motor vehicle safety standards" when enumerating the substantive requirements by which such standards were to be judged, the proper interpretation of the Act would clearly appear to be that the objectivity requirement applies only to "motor vehicle safety standards" and does not mandate this requirement for testing devices or procedures. My understanding of Judge Peck's position is that these two clearly delineated statutory concepts are inseparable in all cases involving motor vehicle safety standards. I am in basic disagreement with this view.
 B
 In the context of Standard 208, the clear delineation provided by the National Traffic and Motor Vehicle Safety Act of 1966 between a motor vehicle safety standard and a compliance testing device and procedure is blurred because of the form in which this Standard was issued. Standard 208 specifies performance requirements for a passive restraint system which must protect vehicle occupants in the event of a destructive crash. The Standard establishes basic injury criteria with reference to an anthropomorphic test device conforming to the requirements of SAE Recommended Practice J963, expressed in terms of maximum forces and pressures on critical parts of the body. Three vehicle crash modes-frontal, longitudinal and rollover-are prescribed in which a vehicle is required to meet the injury criteria. It is important to recognize at this point that two technologies are involved in considering this case. First, that of the passive restraint system, which for all practical purposes is the airbag, and second, that of the anthropomorphic test device (dummy). The use of dummies as compliance test instruments and not living persons needs no explanation.
 In my opinion, since compliance testing is a separate and distinct statutory concept the form in which this Standard was issued does not preclude separating the injury criteria (the actual motor vehicle safety standard) from the compliance test device. If this is not done, then an unnecessary conflict with the language of the Act and its legislative history arises. The Act makes it clear that motor vehicle safety standards are to be "performance" standards and consequently must be stated in performance terms: "'Motor vehicle safety standards' means a minimum standard for motor vehicle performance, or motor vehicle equipment performance. . . ." 15 U.S.C. Sec. 1391(2) [Emphasis added].[17] If the language of the Act leaves any doubt as to this proposition, all doubt is removed by the legislative history:
 There is no reference anywhere in the definitions to the concept of "design." Rather, the definitions, and this bill have been written in terms of requiring standards of motor vehicle and equipment performance. The Secretary would not become directly involved in questions of design.
 H.R. Rep. No. 1776, 89th Cong., 2d Sess. 16 (1966).
 Unlike the General Services Administration's procurement standards, which are primarily design specifications, both the interim standards and the new and revised standards are expected to be performance standards, specifying the required minimum safe performance of vehicles but not the manner in which the manufacturer is to achieve the specified performance . . . . Manufacturers and parts suppliers will thus be free to compete in developing and selecting devices and structures that can meet or surpass the performance standard.
 S.Rep. No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2713-14 (1966).
 The majority opinion, however, rests on the assumption that practically and conceptually no distinction or separation is possible between motor vehicle safety standards and compliance testing.[18] To do so, it is inferred, would create an irrational situation where the Agency demands that the automobile industry develop an innovative passive restraint system (airbag) without providing it with the means to test such system during the developmental process to see if in fact it is properly progressing and in the end has adequately complied.[19] Thus the two concepts of a motor vehicle safety standard and compliance testing are merged in the majority's initial discussion of the statutory requirement of objectivity.
 In the absence of objectively defined performance requirements and test procedures, a manufacturer has no assurance that his own test results will be duplicated in tests conducted by the Agency. Accordingly, such objective criteria are absolutely necessary so that "the question of whether there is compliance with the standard can be answered by objective measurement and without recourse to any subjective determination." [Emphasis added].
 By combining "performance requirements" and "test procedures," all under the heading "objective criteria," the opinion expands the meaning of the statutory word "criteria" used in 15 U.S.C. Sec. 1391(2) to be broader than the statutory word "terms" used in 15 U.S.C. Sec. 1392(a),[20] concluding that the objectivity requirement applies to compliance testing.[21] The result is that for purposes of judging whether this Standard is objective the opinion finds the two concepts of motor vehicle safety standards and compliance testing to be inseparable.[22]
 
 
 
 99
 * * *
 
 
 100
 However, there is then created an inconsistency in the majority's position in explaining the necessity for motor vehicle safety standards to be issued in performance terms. The opinion states:
 
 
 101
 The inherent uncertainty of this procedure is no substitute for the specification of an adequate test device, especially in light of the Agency's power to specify such a device. As the Agency noted in Notice 12:
 
 
 102
 "[S]ince the dummy is merely a test instrument and not an item of regulated equipment, it is not necessary to describe it in performance terms; its design could legally be 'frozen' by detailed, blueprint-type drawings and complete equipment spec drawings and complete equipment specifications." [Emphasis added].
 
 
 103
 By employing the word "power" and quoting with approval the Agency's statement, the opinion apparently recognizes the distinction that motor vehicle safety standards and any later compliance testing are separable concepts. In effect then, the opinion separates the two for purposes of considering the performance requirement but ignores this factor when applying the objectivity requirement.
 
 
 104
 The anthropomorphic test device referred to in Standard 208, it should be observed, is specified in design terms, not performance terms.[23] The agency recognizes this fact and correctly justifies its position by impliedly making the differentiation between motor vehicle safety standards and compliance testing devices.[24] The opinion disregards what the Agency in fact has done and remands the case to the Agency to issue further specifications for the compliance test instrument. Since the Act makes clear that motor vehicle safety standards are distinct from methods for inspecting and testing to determine compliance with motor vehicle safety standards, that the statutory requirement of objectivity applies only to motor vehicle safety standards, and since the Agency has impliedly recognized these facts in Standard 208, in my opinion, it is a mistake to apply the objectivity test to the compliance test instrument (dummy).
 
 II
 
 105
 The Act does not define "objective"[25] but the House and Senate Committee Reports indicate what was meant by this word. The House Report states:
 
 
 106
 In order to insure that the question of whether there is compliance with the standard can be answered by objective measurement and without recourse to any subjective determination, every standard must be stated in objective terms.
 
 
 107
 H.R.Rep. No. 1776, 89th Cong., 2d Sess. 16 (1966) [Emphasis added]. The Senate Report, by incorporating an example states: "The Secretary would thus be concerned with the measurable performance of a braking system, but not its design details." S.Rep. No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2714 (1966) [Emphasis added]. Since both these Reports use a derivative of the word "measure" in referring to a motor vehicle safety standard, the word "objective" in 15 U.S.C. Secs. 1391(2) and 1392(a) means that a motor vehicle safety standard is to be prescribed in quantitative or measurable terms-as opposed to qualitative terms.
 
 
 108
 The majority opinion in defining "objective" states:
 
 
 109
 Objective, in the context of this case, means that tests to determine compliance must be capable of producing identical results when test conditions are exactly duplicated, that they be decisively demonstrable by performing a rational test procedure, and that compliance is based upon the readings obtained from measuring instruments as opposed to the subjective opinions of human beings.
 
 
 110
 This expansive definition, in my opinion, is much broader than is necessary to decide this case and consequently should be avoided for several reasons. First, the opinion's statement supposedly limiting its definition of the word "objective" to "the context of this case" is unrealistic. Since this word is statutory language it cannot have a meaning all its own for this particular case, but rather must have a definition which is applicable to all cases arising under 15 U.S.C. Secs. 1391(2) and 1392(a). Second, from this definition the opinion implies that the Agency has an affirmative duty to prescribe, contemporaneously with the issuance of a motor vehicle safety standard, a fully pre-developed compliance testing device. In my opinion, a proper construction of the Act only places a duty on the Agency to delineate a motor vehicle safety standard which is capable of measurement and not necessarily a compliance test instrument and procedure at the time the standard is promulgated.[26] To avoid this unwarranted implication which makes the opinion's definition broader than is necessary to decide this case, the word "objective" should be defined to mean "measurable."
 
 
 111
 Although the opinion does not specifically deal with the petitioners' objection to the rollover requirement of Standard 208, this objection illustrates the danger of such a broad definition of the word. The first injury criterion of Standard 208 requires that all portions of any test device must be contained within the vehicle passenger compartment throughout the vehicle rollover procedure. This requirement anticipates measurement by visual inspection. In my view it is stated in objective terms since it may be measured by the eye, but under the opinion's definition of objective even this injury criterion is invalid because conformance would not be "based upon the readings obtained from measuring instruments. . . ."
 
 III
 
 112
 I am in disagreement with Judge Peck's conclusion that the National Traffic and Motor Vehicle Safety Act of 1966 places the sole burden of developing compliance test devices and procedures upon the Agency[27] and the underlying assumption upon which this conclusion is based: that a prerequisite to the issuance of a motor vehicle safety standard is a fully pre-developed compliance test device and procedure.[28] Neither of these views is supportable by the language of the Act nor its legislative history.
 
 
 113
 The sweeping Congressional plan to "reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents"[29] invests broad discretionary powers in the Agency in order to implement this legislative purpose. The aim of this Congressional enactment, evidenced by its language and history, is to create a scheme whereby the federal government, acting through the National Highway Traffic Safety Administration, could compel the automobile industry to develop and apply new technology to improve the safety of motor vehicles as rapidly as possible.[30] The primary means to see this intention to fruition is the promulgation by the Agency of federal motor vehicle safety standards requiring the development and application of new safety technology for motor vehicles.[31]
 
 
 114
 [T]his legislation reflects the faith that the restrained and responsible exercise of Federal authority can channel the creative energies and vast technology of the automobile industry into a vigorous and competitive effort to improve the safety of vehicles.
 
 
 115
 S.Rep. No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2709 (1966). This same Report continues:
 
 
 116
 [A] principal aim is to encourage the auto industry itself to engage in greater auto safety and safety-related research. In recent years the firms comprising the industry have spent substantial sums for research, but they are capable of doing more. In the area of auto safety, expenditures have been relatively small.
 
 
 117
 S.Rep. No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2718 (1966). Further, the language of 15 U.S.C. Secs. 1392(c), 1392(e) and 1407 giving the Agency the power to amend or revoke motor vehicle safety standards and determine when they are to be implemented, unequivocally demonstrates the Congressional intention of immediately allowing the public to benefit from newly developed technology in automobile safety and safety-related research. As stated in the Senate Report:
 
 
 118
 The power to specify a later effective date is needed because it may be a practical economic and engineering impossibility, as well as a source of great hardship and unnecessary additional cost, to require that all vehicle changes required by any new safety standard, whatever its scope or subject matter, be accomplished by all manufacturers for all their new vehicles within 1 year.
 
 
 119
 S.Rep. No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2714-15 (1966). Yet in the face of this Congressional plan the majority stops short.
 
 
 120
 Judge Peck specifically finds in Part III of the opinion that:
 
 
 121
 the Agency is empowered to issue safety standards which require improvements in existing technology or which require the development of new technology, and it is not limited to issuing standards based solely on devices already fully developed.
 
 
 122
 I fully concur with this result. However, Part IV of the opinion holds that:
 
 
 123
 while they [the automobile industry] can be required to develop a new device not presently existing, we do not think that they can (or should) simultaneously be required to develop a testing device by which the safety device is to be measured.
 
 
 124
 I disagree with this view for, as I have indicated, the Act does not comport with such an interpretation. Since this legislation encompasses the development of new technology by the automobile manufacturers, there is no rational objection for requiring the development or refinement of new testing devices and procedures by the automotive industry as part of its development of technological advances in motor vehicle safety.[32] Therefore, I conclude that the Agency does not have the sole burden of developing the anthropomorphic test instrument.
 
 
 
 * * *
 If the statutory concepts of motor vehicle safety standards and compliance testing are not separated, the effect is substantially to undermine the legislative scheme. Under the majority's view in a case such as this where there are two technologies involved-that of the passive restraint system (airbag) and that of the anthropomorphic test instrument (dummy)-the development of the airbag must await the full development of the compliance test device. My view is that it puts the cart before the horse to require a completely pre-developed testing device and procedure as a prerequisite to promulgating an objective motor vehicle safety standard. The purpose of compliance testing (in this case the use of the dummy) is to allow the Agency to determine whether some technical mechanism developed by an automobile manufacturer and installed in a motor vehicle (in this case an airbag) conforms to the previously issued, objectively stated motor vehicle safety standard (in this case the injury criteria).[33] The reason for requiring an objective standard is to permit the Agency to measure whether the injury criteria have been met once the airbag is fully developed to avoid as much as possible subjective Agency determinations and protect the manufacturer from arbitrary Agency actions. The purpose of compliance testing is not to shortcut the industry's research efforts in developing the airbag by providing it with the means to test such system during the developmental stage to see if in fact it is properly progressing. The legislative history clearly indicates that the federal government is to contribute to the development of new technology for motor vehicle safety but the primary burden was deliberately placed on the auto industry by Congress. It disconceives this legislative scheme as well as the nature of research to require a pre-developed testing technique for a yet undeveloped technical device required by a motor vehicle safety standard.[34] New testing procedures progress only as they are needed by advancing technology and to deny the Agency (and consequently the motoring public) the advantage of picking and choosing among the best of newly developed testing devices and procedures is unwarranted.
 The Act states:
 The Secretary is authorized to advise, assist and cooperate with . . . private agencies, in the planning and development of-
 
 
 
 125
 * * *
 
 
 126
 (2) methods for inspecting and testing to determine compliance with motor vehicle safety standards.
 
 
 127
 15 U.S.C. Sec. 1396.[35] This section mentions nothing concerning the simultaneous issuance of compliance testing procedures with motor vehicle safety standards nor is such an intention found in any other section of the Act or in its legislative history. If, as the opinion states, the sole burden is on the Agency to develop the compliance test instrument then the statutory words in 15 U.S.C. Sec. 1396 that the Agency is to "assist and cooperate" do not mean what they say.
 
 
 128
 Also it cannot be emphasized too strongly that the most potent weapon in the Agency's arsenal to achieve motor vehicle safety is its power, conferred by the Act, to compel the industry to develop new technology through the issuance of motor vehicle safety standards. Yet, if the rational of the majority is adopted, industry is in effect relieved from the responsibility of developing a concomitant part of new automotive safety technology since without a previously developed testing device and procedure the Agency is powerless to press industry toward this end. Where, as in this case, two distinct technologies are involved, the simultaneous development of both on the part of industry would appear to go hand in hand and indeed compliment one another. As stated in Judge Peck's opinion:
 
 
 129
 the Agency is empowered to issue safety standards which require improvements in existing technology or which require the development of new technology, and it is not limited to issuing standards based solely on devices already fully developed.
 
 
 130
 Contrary to Judge Peck's analysis, as I construe the Act, this applies not only to a safety standard requiring the development of the airbag but also to compliance testing devices such as the anthropomorphic test dummy.
 
 
 131
 As stated, the Agency has broad discretionary powers under the Act limited only by the substantive requirements of 15 U.S.C. Sec. 1392. The Agency, by going ahead in Standard 208 and detailing a compliance test instrument commensurate with the present state-of-the-art does not change the result. As I read this legislation, the Agency has no duty simultaneously to issue compliance test devices and procedures when promulgating a motor vehicle safety standard although it does have the discretionary power to do so as it has done in this instance.[36] The recommended test instrument in Standard 208 is the best available at this time.[37] The Agency in prescribing this device and sponsoring research on it[38] is fulfilling its research responsibility under 15 U.S.C. Sec. 1395. The only statutory duty imposed on the Agency is to insure that within a reasonable time prior to the effective date of this standard the industry is informed as to the complete specifications of the compliance test instrument to be used by the Agency. The reasonableness of this time period must take into account the myriad factors which only the Agency, not this Court, has the expertise to determine. The industry can be required by the Agency to help develop compliance test devices and procedures and the Agency may capitalize on industry's private efforts. As anthropomorphic test device technology progresses the Agency may refine the instrument to be used in its final compliance tests[39] but to require it to do more than the present state-of-the-art allows is unwarranted.
 
 
 132
 The injury criteria (the actual motor vehicle safety standard) of Standard 208 clearly meet the statutory requirement of objectivity since they are capable of measurement. Therefore, Standard 208 is not invalid as the majority concludes in Part VII.
 
 IV
 
 133
 It follows from the foregoing that the proceeding should not be remanded to the Agency. On the contrary, the petitions should be dismissed and the determinations and orders of the Agency should be upheld.
 
 
 
 [1]
 "Impelled by the awesome destruction of human lives and property on the highways and concerned over serious allegations from many quarters that some automobiles presented serious hazards to safety, Congress authorized [this legislation]." General Motors v. Volpe, 321 F.Supp. 1112, 1115 (D.C.Del.1970) (Footnote omitted.)
 
 
 [2]
 E. g.: A new safety standard has recently been proposed (37 F.R. 7210, April 12, 1972) which, if adopted, will set standards for, inter alia, maximum allowable obstructions in the driver's fields of direct view, light transmittance levels of glazing materials that provide fields of direct view, and visibility of the corners of the vehicle. The express purpose of this rule is to "reduce the likelihood that a motor vehicle will collide with a pedestrian, stationary object, or another vehicle because the driver either did not see the object collided with or saw it too late to avoid collision."
 
 
 [3]
 The Senate Commerce Committee expressed its concern this way:
 "For too many years, the public's proper concern over the safe driving habits and capacity of the driver (the 'nut behind the wheel') was permitted to overshadow the role of the car itself. The 'second collision'-the impact of the individual within the vehicle against the steering wheel, dashboard, windshield, etc.-has been largely neglected. The committee was greatly impressed by the critical distinction between the causes of the accident itself and causes of the resulting death or injury."
 S.Rept. No. 1301, 89th Cong., 2d Sess., 1966, 3, 2, U.S.Code, Cong. and Adm. News, 2710 (1966).
 
 
 [4]
 This is not to imply that the Agency is prohibited from issuing this type of standard, in certain instances, if it wishes to. For example, the Agency might establish minimum performance requirements for braking systems which the industry could only meet by the use of braking systems not necessarily in broad current use
 Even though such a standard would in effect require such devices, the industry would not be foreclosed from developing and implementing other systems which could also comply. We do not hold that the Agency is precluded from such a course of action; we only conclude that it has done so in this case.
 
 
 [5]
 None of the consolidated cases request a review of Notices 10, 15, 16, or 19 to 24. Notices 10 and 15 constitute minor changes in the existing standard. Petitions for review have recently been filed in this Court by some of the present petitioners requesting a review of Notice 16 and a determination of its validity. That case has not yet been briefed or argued to this Court. We do not, therefore, discuss in this opinion the relative merits of Notice 16 or rule upon its validity. However, for the purposes of this opinion, we must presume it to be valid. Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138 (1935)
 
 
 [6]
 The injury criteria specified by Standard 208 are maximum values that may be read by instruments placed in the head, chest and upper legs of instrumented test dummies. In the case of chest impacts, the applicable criterion is expressed in terms of "g's," a measurement of deceleration. Except for "peaks" of very short duration, the chest's deceleration may not exceed 60 g's. For the head, the criterion is expressed as a "severity index," a mathematically computed value which is intended to take into account not only "g" levels but also the total duration of the numerous "peaks" recorded by the instruments; the maximum severity index permitted is 1,000, as calculated by the method adopted in Notice 19. In the case of the knee and upper leg, the criterion is load (expressed in pounds), and a maximum of 1,400 pounds is allowed
 
 
 [7]
 Under options 2 and 3 the outboard positions, front and rear, must have emergency locking or automatic retractors for lap belts. Shoulder belts can have manual adjustment or emergency locking retractors. Belts must release at a single point by pushbutton action. All belt warning systems must have a continuous or intermittent audible signal and a continuous or flashing light displaying "Fasten Seat Belts" or "Fasten Belts" when the ignition switch is on and the transmission gear selector is in any forward position
 
 
 [8]
 The interlock system must prevent the starting of the engine if any front seat occupant does not have his belt fastened. The occupant must be seated before the belt system is fastened, and unfastening a belt after the engine is started may not stop the engine, but must activate a lightsound warning system
 
 
 [9]
 The Amicus Center for Auto Safety considers these limitations to be "only the most general of constraints." This is a contention, in effect, that the Standard itself cannot be reviewed, but only the procedure from which it evolved
 
 
 [10]
 The Court found that there was substantial support in the record for the conclusion that the safety device which was the subject of the standard under review contributed to consumer safety so as to warrant its inclusion in all newly manufactured automobiles. 407 F.2d at 342. The Court observed that its function as a reviewing court was to determine whether the Agency acted in a "manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application." 407 F.2d at 338. We fail to see how a court can make this determination without reviewing the record upon which the Agency's rule was based
 
 
 [11]
 In 1904, Mr. Justice Brown summarized these principles in Bates & Guild Co. v. Payne, 194 U.S. 106, 109-110, 24 S.Ct. 595, 597, 48 L.Ed. 894 (1904):
 "[W]here the decision of questions of fact is committed by Congress to the judgment and discretion of the head of a department, his decision thereon is conclusive; and that even upon mixed questions of law and fact, or of law alone, his action will carry with it a strong presumption of its correctness, and the courts will not ordinarily review it, although they may have the power, and will occasionally exercise the right of so doing."
 See also, L. Jaffe, Judicial Control of Administrative Action, 575-76 (1965).
 
 
 [12]
 While not necessary to a determination of this question, we note that the Congressional Committee reports are explicit on this subject. The House report states that whether the Secretary proceeds formally or informally he must "establish a record which shall be the basis for his actions" and that the review provision of Section 105(a)(3) of the Act incorporating Section 10 of the APA "means (1) that a reviewing court will consider the entire record before it and (2) that the findings of the Secretary will be sustained when supported by substantial evidence on the basis of the entire record." H.R.Rep.No.1776, 89th Cong., 2d Sess., pp. 16-21. The Senate report is to the same effect, S.Rep.No.1301, 89th Cong., 2d Sess., pp. 7-8
 
 
 [13]
 The defense that the standard is invalid because it is not practicable, does not meet the need for motor vehicle safety, or is not stated in objective terms might also be raised in an action brought pursuant to 15 U.S.C. Sec. 1399. This section confers jurisdiction upon the United States District Courts to restrain violations of the Act or to restrain the sale or the introduction into interstate commerce of any motor vehicle or item of motor vehicle equipment which is determined not to conform to applicable Federal standards. Also, we note that 15 U.S.C. Sec. 1397(c) expressly preserves all common law liability with respect to compliance with any Federal motor vehicle safety standard. Therefore, although compliance with Federal standards is not a defense to a products liability action for failure to use reasonable care in design or construction to avoid subjecting the user to an unreasonable risk of injury, non-compliance with a valid safety standard may constitute negligence per se. See: Larsen v. General Motors Corp., 391 F.2d 495, 503, n. 5 (8th Cir. 1968)
 
 
 [14]
 The legislative history of the Act supports this conclusion. (See footnote 4, supra.)
 "Any person who believes himself to be adversely affected by the promulgation of a standard may obtain judicial review, in accordance with section 10 of the Administrative Procedure Act. The Administrative Procedure Act sets forth the long-established criteria for judicial review of agency action and provides that agency findings shall be upheld if supported by substantial evidence on the record considered as a whole." Senate Report No. 1301, June 23, 1966, 2 U.S. Code, Cong. & Admin.News, 89th Cong., 2d Sess., 2709, 2715-16 (1966).
 In addition, we note that Professor Davis, after an examination of the various proposed scopes of review of evidence concludes that "review of evidence, as distinguished from review of other questions in a case, probably cannot feasibly be reduced to something less than what is customary under the substantial-evidence rule." 4 C. Davis, Administrative Law Treatise, Sec. 29.07 (1958).
 
 
 [15]
 This is not to imply that the automobile manufacturers were intended to bear the entire burden of developing the required technology. To the contrary, the Act established a research and development section in the Agency itself (15 U.S.C. Sec. 1395), and it is clear that automobile equipment manufacturers have a substantial interest in and are also encouraged to develop new safety devices, for their own profit, if for no other reason. For example, none of the petitioners in this Court is developing its own airbag system. Presently, systems are being developed by General Motors, which has announced that its system will be available, in whole or in part, to any other manufacturers who wish to purchase it, and by Eaton, Inc., Allied Chemical Corp., and Irvin Industries. The process of innovation envisioned by Congress was concisely outlined by Congressman Springer:
 "Then, as new and better systems and devices are developed, either by the automobile industry itself, the equipment manufacturers, or by research and experiment supported by private or governmental sources, those devices will become part of the expected standard for late models." 112 Cong.Rec. 19630 (1966).
 
 
 [16]
 The Automobile Manufacturers Association transmitted to the House Committee several amendments to HR 13228 (the House Bill) proposing a requirement that:
 ". . . the Secretary, in proposing and issuing orders establishing, amending, or withdrawing Federal motor vehicle safety standards under this section, shall be guided so far as practicable by the following criteria, and the Secretary shall include in each such order findings of fact with respect thereto:
 "(2) The standard shall be consistent with the continuation or adoption by motor vehicle manufacturers of efficient designing, engineering, and manufacturing practices, and with innovation, progressiveness, and customary model changes in the automotive industry.
 "(3) The standard, the means of complying with the standard, and the methods of testing for compliance should embody feasible devices and techniques that are available or can be made available in a reasonable time and at costs commensurate with the benefit to be achieved.
 "(5) The standard should be made effective so as to allow adequate time for compliance, taking into account the time required for designing, engineering, tooling and production. . . ."
 Hearings Before the Committee on Interstate and Foreign Commerce, U.S. House of Representatives, 89th Cong., 2d Sess., on H.R. 13228, "Part 2, Traffic Safety," p. 1203.
 None of these specific restraints sought by the Automobile Manufacturers Association was adopted, and we must decline to write into the Act the very same suggestions which Congress declined to write into the Act.
 
 
 [17]
 This schedule was announced in June, 1970; on February 25, 1972, General Motors revised its schedule somewhat and now plans to introduce an experimental system for the front seat occupants in up to 1,000 1973 model cars
 
 
 [18]
 These statements refer to the requirements of the standard in effect at that time, which required passive protection for front seat occupants in frontal crashes only for a deadline of August, 1973. Eaton, on July 8, 1971, indicated that it was prepared to produce airbag systems which it felt could meet these requirements for all cars of all sizes and that, if orders were made immediately, it could produce such systems for the 1973 deadline
 
 
 [19]
 The House Report indicates that "practicable" requires consideration of all relevant factors, including the technological ability to achieve the goal of a particular standard. See supra, at page 19
 
 
 [20]
 Another analysis of 160 accident cases revealed that 99% of all lap and shoulder belt users "either had no injury or only minor injury," and that the only two fatalities among such persons occurred "under unusual circumstances." Nelson, Lap-Shoulder Restraint Effectiveness in the United States, Automotive Engineering Congress (1971)
 
 
 [21]
 The Act authorizes civil penalties of up to $1,000 for each nonconforming vehicle, subject to a maximum of $400,000. 15 U.S.C. Sec. 1398(a). Injunctive relief is also authorized to restrain the sale or the importation into the United States of any motor vehicle or item of motor vehicle equipment which is determined not to conform to applicable Federal motor vehicle safety standards. 15 U.S.C. Sec. 1399 (a)
 
 
 [22]
 This definition of objectivity is taken from the Amicus Center for Auto Safety's comments to the publication of Notice 4, in which the Center objected to the lack of objectivity inherent in the specified test device. With reference to the objections voiced in part II of the dissent, it is observed that a test procedure such as the rollover test, which is dependent upon simple visual observation, where there is no room for disagreement concerning the results and which is not dependent upon the subjective opinions of human beings would be objective as that term is used in this legislation
 
 
 [23]
 Section 4.1 of SAE J963 states only that: "The head shall consist of composite structures that are geometrically similar to the human head. The basic structure shall have an accessible internal ballast and instrumentation cavity and a pliable external covering with appropriate surface contours." The absence of any specification for the thickness and impact characteristics of the pliable external covering of the dummy may also result in significant variations in forces recorded on the dummy during an impact
 
 
 [24]
 The Amicus Center for Auto Safety, in its comments to the Agency concerning Notice 4, concluded:
 "SAE J963 is actually an incomplete specification for a design. Numerous motion characteristics as functions of forces are not mentioned. . . . This means that any person desiring to acquire a dummy must hire an engineer to complete the design. It also means no two auto manufacturers would be likely to test with identical configurations of dummies unless they obtained their dummies from the same source."
 
 
 [25]
 The Agency stated in Notice 12:
 "Considerable development work is in process under various auspices to refine the dynamic characteristics of anthropomorphic devices, to determine which designs are most practicable, offer the most useful results, and best simulate the critical characteristics of the human body. The NHTSA is monitoring this work (and sponsoring some of it), and intends to propose amendments of the standard in accordance with it to add more detailed performance and descriptive specifications for the test dummies, although no changes are being made in that respect by this notice." 36 F.R. 19255.
 
 
 [26]
 None of the other petitioners in this case make this argument because none of the other petitioners make convertibles or sports cars in any significant numbers
 These types of automobiles, however, constitute a major portion of the production of this petitioner. The Automobile Importers of America is an unincorporated association representing its member companies: Alfa Romeo, Inc., British Leyland Motors, Inc., Bayerische Motoren Werke AG, Citroen Cars Corporation, Van Doorne's Automobielfabrieken N.V., FIAT Motor Company, Inc., Fuji Heavy Industries Ltd., American Honda Motor Co., Inc., Lotus Cars Ltd., Mazda Motors of America, Inc., Mitsubishi Motors Corporation, Nissan Motor Corp. in U.S.A., Peugeot, Inc., Renault, Inc., Rolls-Royce, Inc., SAAB-SCANIA of America, Inc., Toyota Motor Sales, U.S.A., Inc., and Volvo, Inc.
 
 
 [27]
 The Agency has promulgated regulations which permit any interested person to file petitions for reconsideration, 49 C.F.R. Sec. 553.35, and which allow the Secretary either to "issue a final decision on reconsideration without further proceedings, or he may provide such opportunity to submit comment or information and data as he deems appropriate," 49 C.F.R. Sec. 553.37, and to "initiate any further rulemaking proceedings that he finds necessary or desirable." 49 C.F.R. Sec. 553.25
 
 
 [28]
 The Agency's technical reference section also maintained a list of current research projects
 
 
 [29]
 This is not to understate the importance of the record to this case. Our comments in section II of this opinion clearly indicate that the entire record upon which the Secretary based his order is essential to a subsequent judicial review of his actions
 
 
 [1]
 15 U.S.C. Secs. 1381, 1391, 1392, 1393, 1396, 1397, 1399, 1400, 1401, 1402, 1403, 1408 and 1410
 
 
 [2]
 15 U.S.C. Sec. 1396 [hereinafter this phrase is referred to as compliance testing]
 
 
 [3]
 15 U.S.C. Secs. 1391(2) and 1392(a)
 
 
 [4]
 From the petitioners' brief it appears that only American Motors Corporation and Jeep Corporation specifically object to the rollover test procedure. Automobile Importers of America raises neither of these objections
 
 
 [5]
 Judge Peck's opinion labels the preceding sentence of his opinion as the actual holding of Part IV:
 While we have concluded that automobile manufacturers can (and should) be compelled by automobile safety standards to develop new safety devices, we hold that the performance goals which they must meet must be clearly delineated by the Agency. [Emphasis added].
 Standing alone, out of context, this sentence appears to be correct. However, the key to understanding the meaning of the sentence is the words "performance goals." What is meant by "performance goals" is made abundantly clear in the next sentence:
 That is to say, while they [the automobile industry] can be required to develop a new device not presently existing, we do not think that they can (or should) simultaneously be required to develop a testing device by which the safety device is to be measured. [Emphasis added].
 Further clarification appears in the next paragraph where the opinion uses the language "performance standards (injury criteria and test procedures)." [Emphasis added]. At this point the opinion uses the word "standards" whereas in the language quoted earlier it uses the word "goals." Evidently the same meaning is intended. Consequently, by failing to differentiate between a motor vehicle safety standard and compliance testing, the opinion, as I see it, misapprehends the Act.
 
 
 [6]
 The language which leads to this conclusion appears in the first two paragraphs of Part IV of the majority opinion
 
 
 [7]
 The Congressional Committee Reports on the National Traffic and Motor Vehicle Safety Act of 1966 paint a grim picture
 It should not be necessary to call again the grim roll of Americans lost and maimed on the Nation's highways. Yet the compelling need for the strong automobile safety legislation . . . lies embodied in those statistics: 1.6 million dead since the coming of the automobile; over 50,000 to die this year. And, unless the accelerating spiral of death is arrested, 100,000 Americans will die as a result of their cars in 1975.
 S.Rep.No. 1301, 89th Cong., 2d Sess., 2 U.S.Code Cong. and Admin.News, 2709 (1966).
 In addition to the deaths, there are millions who have suffered severe and permanent injuries. The cost in dollars of [1965's] traffic accidents has been estimated at $8 billion and the cost in terms of grief and suffering is immeasurable.
 H.R.Rep.No. 1776, 89th Cong., 2d Sess. 10 (1966).
 
 
 [8]
 S.Rep.No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2714 (1966)
 
 
 [9]
 Further amplification of this intent is provided by the legislative history of the Act. "Motor vehicle safety is the paramount purpose of this bill. . . ." H.R.Rep.No. 1776, 89th Cong., 2d Sess. 16 (1966). "The committee intends that safety shall be the overriding consideration in the issuance of standards under this bill." S.Rep.No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2714 (1966)
 Every court which has considered this Act has pointed out that the essential concern of Congress was to reduce traffic accidents. See, e. g., Chrysler Corporation v. Tofany, 419 F.2d 499, 508 (2d Cir. 1969); Boating Industry Association v. Boyd, 409 F.2d 408, 410 (7th Cir. 1969).
 
 
 [10]
 Not only did Congress make the legislative determination that motor vehicle safety standards must be imposed but considerable urgency was attached to the time when such standards should be issued. "The unconditional imposition of mandatory standards at the earliest practicable date is the only course commensurate with the highway death and injury toll." S. Rep.No. 1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2712 (1966)
 
 
 [11]
 The original Act conferred authority upon the Secretary of Commerce to issue motor vehicle safety standards. Act of Oct. 15, 1966, Pub.L.No.89-670, Secs. 103 (a), 102(10), 80 Stat. 718. By subsequent legislation all authority and functions under the Act were transferred to the Secetary of Transportation. 49 U.S.C. Sec. 1655(a)(6)(A). Presently the authority to issue motor vehicle safety standards has been delegated to the National Highway Traffic Safety Administration (NHTSA). 49 C.F.R. Sec. 1.4 (1972). In this opinion the term Agency refers to the NHTSA which has the power to issue motor vehicle safety standards
 
 
 [12]
 This definition also establishes that motor vehicle safety standards must be performance standards and consequently must be stated in performance terms
 It should be noted that 15 U.S.C. Sec. 1392(f)(3) states several factors which the Agency should also consider in prescribing a motor vehicle safety standard.
 In prescribing standards under this section, the Secretary shall-
 (3) consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed.
 
 
 [13]
 Webster's Third New International Dictionary 538 (3rd ed. 1966)
 
 
 [14]
 Id. at 2358
 
 
 [15]
 The Senate and House Reports make no mention of this discrepancy in word choice
 
 
 [16]
 The Senate Committee's comments upon 15 U.S.C. Sec. 1396 also indicate that motor vehicle safety standards are to stand independently of any compliance testing
 The Secretary is authorized to cooperate with and enter into cooperative agreements with other Federal agencies, State or other public agencies, manufacturers of motor vehicles and motor vehicle equipment and other businesses, universities, or other institutions in the planning and development of safety standards, methods for inspecting or testing under safety standards, and methods and equipment for testing motor vehicles and motor vehicle equipment.
 S.Rep.No.1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2718 (1966) [Emphasis added].
 
 
 [17]
 "'Motor vehicle safety' means the performance of motor vehicles or motor vehicle equipment. . . ." 15 U.S.C. Sec. 1391(1) [Emphasis added]
 
 
 [18]
 In other words in accordance with the majority opinion "motor vehicle safety standards" necessarily include any "methods for inspecting and testing to determine compliance with motor vehicle safety standards" and therefore the concepts are in effect synonymous
 
 
 [19]
 The opinion states: "[I]t seems to us axiomatic that a manufacturer cannot be required to develop an effective restraint device in the absence of an effective testing device. . . ."
 
 
 [20]
 As illustrated in Part IA of my dissent this is not a proper reading of these sections
 
 
 [21]
 Several other sentences from the majority opinion eradicate any doubt that the objectivity requirement is applied to compliance test procedures and devices
 The record supports the conclusion that the test procedures and the test device specified by Standard 208 are not objective. . . .
 Further recitation of statements from the record that the test procedure and devices of Standard 208 lack objectivity is unnecessary. . . .
 
 
 [22]
 The majority opinion relies on a statement in the House Report to support its conclusion that the objectivity requirement applies to any compliance testing instrument as well as the motor vehicle safety standard
 In order to insure that the question of whether there is compliance with the standard can be answered by objective measurements and without recourse to any subjective determination, every standard must be stated in objective terms.
 At best, this statement is inconclusive to support the position taken in the opinion. This comment merely states that a motor vehicle safety standard must be prescribed in objective terms in order to permit later compliance testing by quantitative measuring processes instead of subjective human judgments. The House Committee Report mentions nothing concerning a requirement of objective statement for compliance testing. The quoted statement may be relied upon to support the conclusion reached in the opinion only if it is construed to mean: First, that a necessary requisite of an objectively stated motor vehicle safety standard is an equally objectively stated testing procedure; and second, that an essential prerequisite of an objective motor vehicle safety standard under this legislation is a contemporaneously issued, completely pre-developed compliance testing device or procedure. (This latter contention is fully developed in Part III of my dissent).
 Of course to achieve scientific results any compliance testing instrument or procedure would necessarily have to be reasonable, rational and have some degree of objectivity inherent in it, but this is a separate question from the objectivity of the motor vehicle safety standard itself. Since we are dealing with the English language in construing the Act, it must be admitted we start with an imprecise measuring tool. However, objectivity is relative in the sense that there are varying degrees of this word. Therefore, a given objective motor vehicle safety standard may be judged by a testing procedure which is somewhat less objective than the standard itself. This, however, neither affects the initial objectivity of the safety standard nor makes the testing procedure unreasonable or irrational. In such a case the compliance testing may still produce valid results.
 Under an analysis which would not differentiate between a motor vehicle safety standard and compliance testing (as set forth in the majority opinion), this contingency would require that the whole motor vehicle safety standard be invalidated or alternatively, that a double definition of the word "objective" be employed.
 
 
 [23]
 Of course under the Act, the Agency does have the responsibility of issuing compliance test procedures within a reasonable time before the effective date of a motor vehicle safety standard (See Part III of my dissent), but in this case the issuance of performance standards for a compliance test dummy would provide no assistance to the petitioners
 
 
 [24]
 Although the opinion quotes from Notice 12 a more complete extraction is illustrative
 It would actually be difficult, if not impossible to describe the test dummy in performance terms with such specificity that every dummy that could be built to the specifications would perform identically under similar conditions. Of course, since the dummy is merely a test instrument and not an item of regulated equipment, it is not necessary to describe it in performance terms; its design could legally be "frozen" by detailed blueprint-type drawings and complete equipment specifications. Such an action does not, however, appear to be desirable at this time.
 
 
 [36]
 Fed.Reg. 19255 (1971). This shows that the Agency recognizes the distinction between motor vehicle safety standards and compliance testing. Compliance testing devices and procedures do not have to meet the performance requirement of 15 U.S.C. Sec. 1391(1) and (2) nor do they have to meet the objectivity requirement of 15 U.S.C. Secs. 1391(2) and 1392(a)
 Also implicit in this statement is the recognition of the broad discretionary powers vested by the Act in the Agency concerning compliance testing. Infra, note 36 and accompanying text.
 
 
 [25]
 15 U.S.C. Secs. 1391(2) and 1392(a)
 
 
 [26]
 See Part III of my dissent
 
 
 [27]
 Supra, note 5 and accompanying text
 
 
 [28]
 Supra, note 19
 
 
 [29]
 15 U.S.C. Sec. 1381
 
 
 [30]
 See Part III of Judge Peck's opinion
 
 
 [31]
 The Act also established a federal research capability. 15 U.S.C. Sec. 1395
 The Federal Government must develop a major independent technical capacity sufficient to perform comprehensive basic research on accident and injury prevention, adequate to test and contribute to the quality of the industry's safety performance; a technical capacity capable of initiating innovation in safety design and engineering and of serving as a yardstick against which the performance of private industry can be measured; and, finally, a technical capacity capable of developing and implementing meaningful standards for automotive safety.
 S.Rep.No.1301, 89th Cong., 2d Sess., 2 U.S.Code, Cong. and Admin.News, 2712 (1966).
 
 
 [32]
 Footnote 16 of the majority opinion supports this position as well. This footnote refers to a proposed amendment to the Act offered by the Automobile Manufacturers Association while the bill was in committee. This proposal was rejected. The opinion correctly cites the rejection of this amendment to support its conclusion that the auto industry can be required to develop new technology for auto safety. This proposal stated:
 the Secretary, in proposing and issuing orders establishing, amending or withdrawing Federal motor vehicle safety standards under this section, shall be guided so far as practicable by the following criteria, and the Secretary shall include in each such order findings of fact with respect thereto:
 (3) The standard, the means of complying with the standard, and the methods of testing for compliance should embody feasible devices and techniques that are available or can be made available in a reasonable time and at costs commensurate with the benefit to be achieved."
 Hearings on H.R.13228, Before Comm. on Interstate and Foreign Commerce, 89th Cong., 2d Sess. Part 2 at 1199 (1966) [Emphasis added].
 After setting forth these proposals in footnote 16, the opinion's footnote continues:
 None of these specific restraints sought by the Automobile Manufacturers Association was adopted, and we must decline to write into the Act the very same suggestions which Congress declined to write into the Act.
 By specifically holding that the industry can not be compelled to develop testing devices and procedures, the opinion inconsistently applies its own proscription against rewriting the Act.
 
 
 [33]
 15 U.S.C. Secs. 1396 and 1401
 
 
 [34]
 It is recognized that at any given time in the development of the airbag only developed testing methods may be employed to determine progress. However, dummies of this sophistication have not yet been created since their need has only become apparent with the development of the airbag. Consequently, as airbag technology progresses dummy technology will advance concomitantly. I do not understand this Act to require any other result
 
 
 [35]
 The Senate Report indicates the language "private agencies" means manufacturers of motor vehicles and motor vehicle equipment. S.Rep.No.1301, 89th Cong. 2d Sess., 2 U.S.Code, Cong. and Admin. News, 2718 (1966)
 
 
 [36]
 Supra, note 24. The Agency's broad discretionary powers are illustrated by several Agency comments. In Notices 4 and 7 the Agency stated:
 The performance requirements are stated primarily in terms of crash tests that are destructive. These requirements, as in all the standards, are simply methods of expressing necessary charcateristics of each vehicle produced. Manufacturers must, of course, under the Vehicle Safety Act exercise due care to ensure that their vehicles will meet these tests, but may develop efficient, economical and reliable methods, other than performing the stated destructive tests to do this.
 
 
 [35]
 Fed.Reg. 7188 (1970)
 The objection that requiring protection across ranges of angles and speeds would require an infinite number of manufacturer tests is without merit. The standard does not prescribe manufacturer tests, expressly or by implication but requires each manufacturer to ensure by appropriate means that his vehicles meet the requirements when tested within the range of specified conditions.
 
 
 [35]
 Fed.Reg. 16928-29 (1970)
 Although these statements are in reference to the crash modes of Standard 208 they are representative of the Agency's function under the Act. Of course the injury criteria are what each manufacturer must insure its vehicles meet but these statements recognize the industry's duty with regard to compliance testing.
 
 
 [37]
 Based upon a reading of the record it is apparent that the compliance testing device referred to in Standard 208 is commensurate with the present state-of-the-art of dummy technology. See 35 Fed.Reg. 7188 (1970); 35 Fed.Reg. 16929 (1970); 36 Fed.Reg. 4602 (1971); 36 Fed.Reg. 19255 (1971)
 
 
 [38]
 36 Fed.Reg. 19255 (1971)
 
 
 [39]
 This is the function of the amendment procedure provided for in 15 U.S.C. Secs. 1392(c), 1392(e) and 1407. See Part VI of Judge Peck's opinion